UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

-------------------------------------------------------------------X

BOARD OF TRUSTEES OF THE BAKERY DRIVERS
LOCAL 550 AND INDUSTRY PENSION FUND,

            Plaintiff,

    -against-

PENSION BENEFIT GUARANTY CORPORATION,

           Defendant.

-------------------------------------------------------------------X

**ORDER**

23-CV-1595 (JMA) (JMW)

**FILED**
**CLERK**

10/26/2023 4:05 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

    Before the Court are competing motions for summary judgment by Plaintiff Board of Trustees of the Bakery Drivers Local 550 and Industry Pension Fund (the "Fund") and Defendant Pension Benefit Guaranty Corporation ("PBGC"). The Fund moves for summary judgment and seeks a determination that PBGC's denial of its application for government-backed financial assistance was erroneous as a matter of law and seeks vacatur of that denial. PBGC cross-moves for summary judgment and asks the Court to affirm its decision to deny the Fund's financial assistance application. For the below reasons, PBGC's motion is GRANTED and the Fund's motion is DENIED.

## I.   BACKGROUND

### A.  <u>Regulatory Scheme</u>

    In 1974, in response to concerns over the growth in size and the unregulated state of the employee benefit plan sector, Congress passed the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829, 829 (codified at 29 U.S.C. § 1001 <u>et</u> <u>seq.</u>). One of ERISA's "principal purposes" was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits." <u>Fisher v. Pension Benefit Guar. Corp.</u>, 468 F Supp 3d 7, 14-16 (D.D.C. 2020), <u>aff'd,</u> 994 F.3d 664 (D.C. Cir. 2021) (internal quotations and

citations omitted).  To accomplish this purpose, Title IV of ERISA created a plan termination insurance program, administered by the PBGC.  Id.; see also 29 U.S.C. § 1301 et seq.  That program protects plan participants "by guaranteeing a class of 'nonforfeitable benefits,' [and by] reimbursing eligible participants or beneficiaries when a guaranteed plan terminates without sufficient funds."  Davis v. PBGC, 734 F.3d 1161, 1164 (D.C. Cir. 2013) (quoting 29 U.S.C. § 1322(a)).  ERISA authorizes the PBGC to promulgate rules and regulations "as may be necessary to carry out the purposes of [Title IV of ERISA]."  29 U.S.C. § 1302(b)(3).

As relevant here, in the midst of the COVID-19 pandemic, Congress passed the American Rescue Plan Act of 2021 ("ARP"), which amended Title IV of ERISA to create a new "special financial assistance" ("SFA") program, administered by PBGC, to give eligible multiemployer plans money projected to be sufficient to pay all benefits due through 2051.  See 29 U.S.C. § 1432(a)(1).  The Special Financial Assistance ("SFA") program, like all provisions of Title IV, is administered by PBGC.  Unlike PBGC's regular multiemployer insurance program, which is funded by insurance premiums, the SFA program is funded from general taxpayer monies.  See 29 U.S.C. § 1305.  Under the SFA program, PBGC "shall provide special financial assistance to an eligible multiemployer plan" that satisfies one of the four criteria found in Section 1432(b)(1):

A. The plan is in critical and declining status (within the meaning of section 1085(b)(6) of this title) in any plan year beginning in 2020 through 2022;

B. A suspension of benefits has been approved with respect to the plan under section 1085(e)(9) of this title as of March 11, 2021;

C. In any plan year beginning in 2020 through 2022, the plan is certified by the plan actuary to be in critical status (within the meaning of section 1085(b)(2) of this title), has a modified funded percentage of less than 40 percent, and has a ratio of active to inactive participants which is less than 2 to 3; or

D. The plan became insolvent for purposes of section 418E of title 26 after December 16, 2014, and has remained so insolvent and has not been terminated as of March 11, 2021.

See 29 U.S.C. § 1432(b)(1).

2

B.    **The Fund's Formation, Initial Termination, and Purported Restoration**

The parties do not dispute the central facts of this case.  PBGC is the federal agency responsible for administering and enforcing Title IV of ERISA.  (Defendant's Rule 56.1 Statement of Material Facts ("Def. 56.1"), ECF No. 27-2, ¶ 1.)  The Fund is a multiemployer defined benefit pension plan that was established in 1955 under an Agreement and Declaration of Trust pursuant to collective bargaining agreements between the Bakery Drivers Union, Local #550 (the "Union"), and large bakeries in the Northeast who are members of the New York City Bakery Employers Labor Council and other employers who agree to participate individually or as groups.  (See Plaintiff's Rule 56.1 Statement of Material Facts ("Pl. 56.1"), ECF No. 26-2, ¶¶ 1-2, 7.)  The Fund has approximately 1,122 members, and its plan sponsor is the Board of Trustees of the Bakery Drivers Local 550 and Industry Pension Fund (the "Trustees").  (Id. ¶¶ 3, 6.)

In 2011, approximately 93% of the Fund's active covered employees were employed by Bimbo Bakeries USA, Inc. ("BBU") and Hostess Brands, Inc. ("Hostess"), with Hostess employing 63% of the active participants.  (Id. ¶ 8.)  Hostess ceased making contributions to the Fund in 2011, did not pay any of its withdrawal liability, and subsequently filed for bankruptcy in 2012.  (Id. ¶¶ 9-10.)  In mid-2016, in order to extend the life of the Fund, the Trustees and PBGC created a multiemployer fund – the Teamsters Bakery Drivers and Industry Pension Fund (the "Teamsters Fund") – which was managed by the Trustees.  (Id. ¶¶ 11-13.)  In November 2016, the Fund's two largest active employers – BBU and a trucking company named Grocery Haulers, Inc. ("GHI") – withdrew from the Fund and triggered a mass withdrawal.  (Id. ¶ 14.)  BBU and GHI made withdrawal liability payments to the Fund of $5.49 million and $1.55 million, respectively, during the plan year that ended October 31, 2017.  (Id. ¶ 15.)  On November 15, 2016, as part of its withdrawal, BBU paid $19 million into the Teamsters Fund to cover the first five years of expected benefit payments.  (Id. ¶ 16.)  PBGC approved the transfer of certain liabilities from the

3

Fund to the Teamsters Fund on or about December 1, 2016.  (Id. ¶ 17.)  The Trustees amended the

Fund's Rules and Regulations consistent with the liabilities transfer effective December 6, 2016.

(Id. ¶ 18.)  On December 17, 2016, the 550 Fund transferred to the Teamsters Fund liabilities for:

(1) all benefits associated with current/active employees of BBU, GHI, the Bakery Drivers Local

550 and Industry Health Benefit Fund, and the Union to the Teamsters Fund; and (2) Fund

participants with one-half or more of their total service with one of the four employers or their

predecessors.  (Id. ¶ 19.)  The liabilities for the 550 Fund remained with the Fund.  The Fund

officially terminated by mass withdrawal on December 17, 2016, and notified PBGC of the mass

withdrawal on or about January 13, 2017.  (Id. ¶¶ 20-21.)[1]

On or about August 25, 2022, and approved by the Trustees effective September 1, 2022,

BBU and the Union agreed to amend the Collective Bargaining Agreement (the "CBA") under

which its Fund-participating employees operated (the "Amendment").  (Id. ¶¶ 22, 24.)  The

Amendment required all covered workers to commence participation in the Fund and required

BBU to resume making benefit contributions to the Fund on behalf of each of its covered

employees.  (Id. ¶¶ 23, 25.)

## C.    The Fund's Initial SFA Application and PBGC's Denial

On September 6, 2022, the Fund filed a certification of its "critical and declining" zone

status[2] with the Internal Revenue Service pursuant to section 432 of the Internal Revenue Code,

which provides additional funding rules for underfunded multiemployer plans.  (Id. ¶ 29.)  In

response to projections from the Fund's October 31, 2020 valuation that it is only 10.4% funded,

---

[1] A terminated fund is required to continue paying benefits to its former beneficiaries, unless and until it decreases the amount of benefits paid in accordance with the requirements of Title IV, including 29 U.S.C. § 1441.

[2] Zone status designations describe a plan's ability to fund and pay promised benefits to participants and beneficiaries now and into the future. See 29 U.S.C. § 1085(b). "Critical and declining status" is the most severe of several "zone statuses" that generally categorize underfunded multiemployer plans by how poorly funded they are. 29 U.S.C. § 1085(b)(6).

PBGC staff purportedly contacted the Fund's Administrator on or about February 15, 2023, to discuss the process for securing traditional financial assistance under section 4261 of ERISA, 29 U.S.C. § 1431.[3]  (Id. ¶¶ 30-31.)

The Fund filed its SFA application on or about September 27, 2022 (the "SFA Application").  (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 34.)  The Fund's SFA Application requested $132,250,472.00 in assistance.  It appears that purpose of the Fund's attempted restoration in September 2022 was to allow it to apply for SFA assistance.

In conjunction with the SFA Application, the Trustees submitted numerous documents, including "actuarial valuation reports, zone certifications, plan documents, actuarial and financial calculations[.]"  (Pl. 56.1 ¶¶ 35-36.)  In its SFA Application, the Fund stated in its application that it "terminated by mass withdrawal 12/17/2016" and that it "was restored 9/1/2022."  (Def. 56.1 ¶ 9.)  The SFA Application also included a included a certification by the Fund's actuary stating that the Fund was, as of September 1, 2022, "in critical and declining status" and that, on that date, the Fund "became subject to [Internal Revenue Code] Section 432[4] as a result of a bargaining unit joining the Plan[,]" and was thus eligible for SFA under 29 U.S.C. § 1432(b)(1)(A).  (Id. ¶¶ 6, 8.)

On or about January 20, 2023, PBGC denied the Fund's SFA Application, based on its contention that "ERISA contains no provision allowing a multiemployer plan that terminated by mass withdrawal under [Section 1341a] to be restored."  (Pl. 56.1 ¶ 38; Def. 56.1 ¶ 11.)

**D.   Procedural History**

The Fund commenced this action on March 1, 2023, seeking "a preliminary injunction or stay of PBGC's denial of its application and PBGC's policy determination that once-terminated

---

[3] According to Plaintiff, the Fund is projected to become insolvent at some point towards the end of the plan year beginning November 1, 2022. (See Pl. 56.1 ¶¶ 32, 37.)

[4] Whether a multiemployer plan is in "critical and declining status" is governed by section 432(b)(6) of the Internal Revenue Code and section 305(b)(6) of ERISA.

funds are automatically ineligible for SFA," and an order setting aside PBGC's denial of its SFA Application and remanding the application to PBGC for additional review.  (See ECF No. 1, ¶¶ 7, 81, 87.)  In lieu of the Fund formally moving for a preliminary injunction, the parties agreed to an expedited summary judgment briefing schedule, which the Court adopted on April 11, 2023.  (See ECF Nos. 18, 19, 21.)  The parties' cross-motions for summary judgment were fully briefed on May 26, 2023.  (See ECF Nos. 26, 27.)

## II.    LEGAL STANDARDS

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).[5]  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

"The same standard of review applies when the court is faced with cross-motions for summary judgment."  Clear Channel Outdoor, Inc. v. City of New York, 608 F. Supp. 2d 477, 492 (S.D.N.Y. 2009), aff'd, 594 F.3d 94 (2d Cir. 2010) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).  In evaluating cross-motions for summary judgment, "[e]ach party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration."  Id. (citing Morales, 249 F.3d at 121).

---

[5] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

However, "even when both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party." Morales, 249 F.3d at 121.

## III.   DISCUSSION

The parties' instant dispute turns on two questions of statutory interpretation:

(1)  Are plans that were terminated by mass withdrawal in a plan year that ended before January 1, 2020 (and remain terminated) eligible for SFA under 20 U.S.C. § 1462(b)(1(A)?;

(2)  Can a multiemployer plan such as the Fund—which was previously terminated via mass withdrawal—be restored after such termination?

This second question is the central issue before the Court.  In considering this question, the Court must consider the potential applicability of the Chevron doctrine.  The parties dispute whether the PBGC's interpretation of the relevant statutes at issue here are entitled to Chevron deference and whether PBGC's interpretation ultimately prevails when analyzed under Chevron.

## A.  Plans That Were Terminated By Mass Withdrawal Before January 1, 2020 and Remain Terminated are Not Eligible for SFA under § 1462(b)(1)(A)

The Fund contends that it qualifies for SFA because it meets the requirements of Section 1462(b)(1)(A), which states that the "plan is in critical and declining status (within the meaning of section 1085(b)(6) of this title) in any plan year beginning in 2020 through 2022."

The first question that the Court must address is whether plans that were terminated by mass withdrawal in a plan year that ended before January 1, 2020 (and remain terminated) are eligible for SFA under Section 1462(b)(1)(A).  As explained below, the Court concludes that such terminated plans are not eligible under Section 1462(b)(1)(A).

Under the Fund's apparent reading, a terminated multiemployer plan may be eligible under Section 1462(b)(1)(A) even if the plan is never restored and remains terminated.  The Fund's interpretation, however, is not supported by the relevant statutory provisions.

7

Section 1462(b)(1)(A) looks to whether the plan is in "critical" or "critical and declining status" under Section 1085(b)(6). While Section 1085(b)(6) does not address the relevance of a plan's termination status to "critical and declining status," Section 1081(c) indicates that certain provisions, including Section 1085(b)(6), cease to apply at the end of a plan year in which the plan terminated by mass withdrawal. Reading Sections 1462(b)(1)(A) and 1085(b)(6) in light of Section 1801(c), the Court concludes that a terminated plan does not have a zone status and, as such, cannot qualify for SFA under Section 1462(b)(1)(A). Thus, unless ERISA allows the Fund to restore itself (and exit "terminated" status), it cannot qualify under Section 1462(b)(1)(A).

This interpretation is in accord with the positions of both PBGC and the IRS, which the Court finds persuasive.[6] The Fund appears to dispute this interpretation and to assert that its pre-January 1, 2020 termination is irrelevant to its eligibility under § 1462(b)(1)(A).[7] (See Pl. Opp./Reply Mem. at 3 ("The plain and unambiguous eligibility criteria in Section 4262(b)(1)(A) of ERISA, 29 U.S.C. § 1432(b)(1)(A) in no way turns on whether a plan terminated prior to 2020."); see generally id. ("Because Congress did not intend for PBGC to exclude from SFA plans that terminated by mass withdrawal in a plan year that ended before January 1, 2020, PBGC's determination that the Fund was ineligible for SFA was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.").

At one point in its opposition papers, the Fund contends that because Section 1462(b)(1)(D) explicitly references certain "terminated" plans, it is irrelevant under Section 1462(b)(1)(A)

---

[6] In July 2022, PBGC issued a final rule which explains that multiemployer plans that terminated due to mass withdrawal prior to January 1, 2020 are not eligible under Section 1462(b)(1)(A). 87 Fed. Reg. 40968, 40971, n.10 (July 8, 2022). In doing so, PBGC relied on binding IRS interpretations, with which the Court agrees. Id.

[7] In its opening brief, the Fund relegates this issue to a footnote remarking that it is "unclear that even a plan that is currently terminated is ineligible for SFA," and that the "Court need not resolve that complicated question, because it is clear that" the Fund is a "a currently active plan." (Pl. Mem. at 14, n. 7.) Moreover, in its subsequent brief, the Fund explicitly concedes that currently terminated plans do not have a zone status. Thus, the Fund admits that when a plan is terminated it ceases to have a zone status. The Fund insists that, after its purported restoration, it "again became subject to the zone-status rules."

whether a plan was terminated.  According to the Fund, if Congress had intended to so exclude

from the SFA Program plans terminated by mass withdrawal in a plan year beginning before 2020,

it would have said so.  However, the Court's analysis of the relevant statutory provisions above

explains why terminated a plan cannot qualify under Section 1462(b)(1)(A).  The fact that Section

1462(b)(1)(D) explicitly address certain terminated plans does not alter the Court's interpretation

of Section 1462(b)(1)(A).

The Funds' arguments about Sections 1081 and 1085 are also unpersuasive.  According to

the Fund,

> ERISA Section 301(c), 29 U.S.C. § 1081(c) does nothing more than make clear that terminated multiemployer plans, although still responsible for the ongoing administration of the plan for the benefit of its participants and beneficiaries, are no longer subject to the statutory funding rules—including the rules requiring certification of the plan's funding status.  However, where a collective bargaining agreement, pursuant to which the plan is maintained, is amended to require employer contributions, the actuary is legally required to make projections regarding the current value of the assets and liabilities for the current and succeeding plan years, Section 1085(b)(3)(B), or face penalties of up to $1,100 per day, Section 1085(b)(3)(C). So, while Congress, did indeed, grant PBGC the authority to review the reasonableness of the underlying funding assumptions, *see* Section 4262(g), there is nothing in the plain language of Section 1081(c) that could reasonably be interpreted as permitting PBGC to disregard an actuary's certification that a plan was in critical and declining status on the basis that the plan had once been terminated by mass withdrawal.

(Pl. Reply Mem. at 11.)  The Fund's argument, however, ignores the explicit language of Section

1801(c), which states that this "part"—which includes Section 1805, where "critical and declining

status" is defined—only applies to a "terminated multiemployer plan . . . until the last day of the

plan year in which the plan terminates." 29 U.S.C. § 1801(c).  The Fund attempts to reads language

into Section 1801(c) that is simply not there.  Section 1801(c) indicates that actuaries are not

required to submit certifications for "terminated" plans.  Thus, the critical question is whether a

terminated multiemployer fund can be restored (and, thus, exit "terminated" status). Sections 1801

and 1805 simply do not speak to that question.[8]   Nor does Section 1462.  Rather, to answer this critical question the Court must examine other provisions of Title IV, including 20 U.S.C. § 1347.

**B.   Under Title IV, Multiemployer Plans Terminated via Mass Withdrawal Cannot be Restored after Termination**

### 1.   The Parties' Arguments Concerning Restoration under Title IV

As explained above, a multiemployer plan that was terminated prior to January 1, 2020 due to mass withdrawal and that remains terminated is ineligible for SFA under Section 1462(b)(1)(A). The Fund, however, contends that it is no longer "terminated" because it was purportedly "restored" in 2022.  The Fund insists that a plan which is terminated prior to January 1, 2020, but is then restored after January 1, 2020, is eligible for SFA under Section 1462(b)(1)(A) because a restored plan has a zone status after January 1, 2020.  According to the Fund, such restorations of terminated plans are permitted.  The Fund's statutory interpretation argument is simple—no provision in ERISA explicitly prohibits or addresses the restoration, by private parties, of multiemployer plans that were previously terminated by mass withdrawal and, thus, such restoration is permitted.

In response, PBGC argues that multiemployer funds such as the Fund cannot be restored under ERISA and that, as such, the Fund's purported restoration in 2022 does not render it eligible for SFA under Section 1462(b)(1)(A).  In support of this argument, PBGC points out that while certain provisions of ERISA explicitly permit restoration of certain types of plans, no provision in ERISA authorizes the "restoration" of multiemployer plans that were previously terminated via mass withdrawal.  In addition to asserting that its interpretation of Title IV is correct, PBGC also maintains that its interpretation of Title IV is entitled to deference under <u>Chevron</u> and that, as such, PBGC's interpretation should prevail as long as it is reasonable.

---

[8] To the extent the Fund is arguing that, under Sections 1801 or 1805, PBGC must defer to the Fund actuary's legal conclusion that a multiemployer plan terminated by mass withdrawal is restorable, the Court rejects that argument, which is not supported by any statutory language cited by the Fund.

## 2. **The <u>Chevron</u> Framework**

When reviewing a challenge to an agency's interpretation of a statute that it administers, courts generally apply the statutory framework outlined by the Supreme Court in <u>Chevron</u>, 467 U.S. at 842-43. At "Step Zero," the Court must satisfy itself that Congress has sufficiently delegated interpretive authority to an agency such that <u>Chevron</u> deference may be triggered. At Step Zero, the Court also considers whether the form of the agency's determination is sufficient to warrant potential deference. <u>See</u> <u>Rahman v. Limani 51, LLC</u>, No. 20-cv-6708, 2022 WL 3927814, at *3, n.6 (S.D.N.Y. Aug. 31, 2022) (internal citations omitted) ("At <u>Chevron</u> step zero, courts ask whether the <u>Chevron</u> framework applies at all.")

After Step Zero is satisfied, Courts move to Step One and ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Catskill Mountains Ch. of Trout Unlimited, Inc. v. Envtl. Protection Agency</u>, 846 F.3d 492, 507 (2d Cir. 2017) (quoting <u>Chevron</u>, 467 U.S. at 842-43). If the Step One analysis yields statutory language that is "silent or ambiguous," however, the Court will proceed to Step Two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute" at issue. <u>See id</u>. (quoting <u>Chevron</u>, 467 U.S. at 843). If it is—i.e., if it is not "arbitrary, capricious, or manifestly contrary to the statute," the Court will accord deference to the agency's interpretation of the statute so long as it is supported by a reasoned explanation, and "so long as the construction is 'a reasonable policy choice for the agency to make'" <u>Id</u>. (quoting <u>Chevron</u>, 467 U.S. at 844-45; <u>Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.</u>, 545 U.S. 967, 986 (2005)),[9]

---

[9] The Supreme Court has granted certiorari in two cases to address the continued viability and scope of <u>Chevron</u> in <u>Loper Bright Enterprises v. Raimondo</u>, 143 S. Ct. 2429 (2023) and <u>Relentless, Inc. v. Dept. of Commerce</u>, 2023 WL 6780370 (U.S. Oct. 13, 2023). This Court must, of course, apply the <u>Chevron</u> doctrine as it currently exists.

### 3. **Analysis under <u>Chevron</u> Step Zero**

At <u>Chevron</u> Step Zero, the Court begins its "initial inquiry into whether the *Chevron* framework applies at all." <u>ClearCorrect Operating, LLC v. Intl. Trade Com'n</u>, 810 F.3d 1283, 1303 (Fed. Cir. 2015); <u>see also</u> <u>Valenzuela Gallardo v. Barr</u>, 968 F.3d 1053, 1059 (9th Cir. 2020) (quoting <u>Or. Rest. & Lodging Ass'n v. Perez</u>, 816 F.3d 1080, 1086 n.3 (9th Cir. 2016)) ("We begin at <u>Chevron</u> Step Zero, where we determine 'whether the <u>Chevron</u> framework applies at all.'"). The Chevron framework only applies where Congress has delegated to the agency the authority to "speak with the force of law" and the relevant interpretation was "promulgated in the exercise of that authority." <u>United States v. Mead Corp.</u>, 533 U.S. 218, 226-27, 229 (2001).

As a threshold matter, the Court must first determine whether Congress sufficiently delegated interpretive authority of Title IV of ERISA to PBGC, such that its interpretation of the relevant provisions of Title IV, including Section 1347, trigger the <u>Chevron</u> deference framework. In support of its argument that Step Zero is satisfied here, PBGC points to the statutory language contained in Section 1302, which explicitly lays out PBGC's role and responsibility in administering and enforcing Title IV. <u>See</u> <u>Fisher</u>, 468 F. Supp. 3d at 14 ("ERISA authorizes the PBGC to promulgate "rules and regulations "as may be necessary to carry out the purposes of [Title IV of ERISA].").

Specifically, Section 1302 states that PBGC has the power to "to adopt, amend, and repeal, by the board of directors, bylaws, rules, and regulations relating to the conduct of its business and the exercise of all other rights and powers granted to it by this chapter and such other bylaws, rules, and regulations as may be necessary to carry out the purposes of this subchapter" and "to enter into contracts, to execute instruments, to incur liabilities, and to do any and all other acts and things as may be necessary or incidental to the conduct of its business and the exercise of all other rights and powers granted to the corporation by this chapter."

12

Additionally, Section 1432(g) directs PBGC to determine whether applicants qualify for SFA and to deny that an application if it finds that the "the plan is not eligible."

The Court finds that § 1302's broad grant of authority to PBFC is sufficient to demonstrate Congress's intent to delegate to it interpretive authority of Title IV of ERISA and, thus, satisfies Step Zero of Chevron.  See, e.g., Lewis v. Pension Benefit Guar. Corp., 314 F. Supp. 3d 135, 151 (D.D.C. 2018), aff'd, 831 Fed. App'x 523 (D.C. Cir. 2020) (citing Beck v. PACE Int'l Union, 551 U.S. 96, 97 (2007)).

The Fund contends that, notwithstanding the grant of authority in Section 1302, Congress did not delegate to PBGC the authority to speak with the "force of law" with respect to the SFA's eligibility criteria, as set forth in Section 1462.  Rather, the Fund asserts that Congress limited PBGC's authority to issuing regulations or guidance for certain discrete topics and appears to take the position that PBGC's role vis-à-vis the SFA application process is akin to that of a mere gatekeeper that rubberstamps eligible applications.  The Court disagrees.

The Fund's argument that the text of the SFA evinces Congress's intent to limit PBGC's interpretive authority under ERISA is unpersuasive.

The Fund relies on two aspects of the SFA.  First, the Fund stresses that Section 1432(a)(1) states that PBGC "shall provide special financial assistance to an eligible multiemployer plan under this section, upon the application of a plan sponsor of such a plan for such assistance."  29 U.S.C. § 1432(a)(1) (emphasis added).  Second, the Fund argues that "Congress expressly limited PBGC's authority to issuing 'regulations or guidance setting forth requirements for special financial assistance applications under this section.' 29 U.S.C. § 1432(c)." and "did not give PBGC authority to determine what plans are eligible for SFA."  (Pl. Reply Mem. at 8.)  In support, PBGC cites to 29 U.S.C. §1432(c), which directs PBGC to "issue regulations or guidance setting forth requirements for special financial assistance applications under this section" and also directs that

13

three specific matters that that must be addressed in those regulations.  The Fund reasons that because these provisions—which direct PBGC to issue regulations concerning applications—and the mandatory directive in the statute highlighted earlier together establish that PBGC loses at Step Zero of the <u>Chevron</u> analysis.

The Fund's arguments about these provisions are not persuasive.  The fact that Congress specifically directed PBGC to issue regulations and guidance on certain topics concerning SFA does not undermine or limit the broader authority granted to PBGC in Section 1302 to interpret the various provisions of Title IV, including Section 1347 and the other statutory provisions discussed below as well as § 1462 which is itself part of Title IV.

The Court also notes that the critical statutory provisions that must be analyzed and interpreted in order to determine whether the once-terminated Fund can "restore" itself are not even found in any of newly passed statutory provisions concerning the SFA.  Rather, the relevant aspects of Title IV that concern termination and restoration were all enacted prior to the passage of the ARP.  Section 1462 and the other statutory provisions that were enacted as part of the ARP do not speak to the question of whether terminated plans can be restored itself and exit terminated status.  Rather, other provisions of Title IV concern the termination and restoration of plans.  And, PBGC is authorized, under Section 1302, to interpret those provisions and Title IV generally.  The provisions in Section 1432 cited by the Fund do not alter that authority.

For these reasons, the Court finds that Congress sufficiently delegated interpretive authority of Title IV of ERISA to PBGC, such that its interpretation of Title IV, including Sections 1347 and related provisions, trigger the <u>Chevron</u> deference framework.

Additionally, the Fund also argues, in footnotes, that PBGC's letter which found the Fund to be ineligible, and reflects PBGC's interpretation of Title IV, was too informal to warrant <u>Chevron</u> deference.  According to the Fund, there is no "indication that the denial letter itself was

14

promulgated with the force of law" and PBGC's denial letter is analogous to the type of determinations that courts have found insufficient to trigger <u>Chevron</u> deference. The Court disagrees. PBGC's determination of eligibility here is not akin to the tariff "ruling letters" that were found insufficient to warrant deference in <u>Mead</u>, 533 U.S. at 226–27. <u>See Lewis</u>, 314 F. Supp. at 151; <u>cf. Apotex, Inc. v. Food & Drug Admin.</u>, 226 F. App'x 4, 5 (D.C. Cir. 2007) (granting Chevron deference to FDA approval letter, which concerned an "informal adjudication[]").

### 4. Analysis Under <u>Chevron</u> Steps One and Two

The Court now turns to the remaining two steps of <u>Chevron</u>. Sections 1341, 1341a, and 1342 provide the bases for termination of Title IV-covered pension plans. Section 1341a addresses the termination of multiemployer plans via mass withdrawal. Other grounds for termination are addressed in Section 1341[10] and 1342.[11] Section 1347, which is Title IV's <u>only</u> provision that addresses the restoration of a terminated plan, authorizes PBGC to restore a plan that is terminated (or is in the process of being terminated) under Section 1341 or 1342. Section 1347, however, is silent as to the ability of a private party (or PBGC) to restore multiemployer plans that are terminated pursuant to Section 1341a.

PBGC contends that this silence as to Section 1341a, when analyzed under the interpretive canon, <u>expressio unius est exclusio alterius</u> (the expression of one is the exclusion of the other), leads to the conclusion that Congress intended to prohibit the restoration of a terminated multiemployer plan under Section 1347. PBGC argues that Sections 1341, 1341a, 1342 are an "associated group" under the <u>expressio unius</u> canon. PBGC further asserts that, given this

---

[10] Section 1341 sets forth the exclusive procedures for terminating single-employer pension plans in a standard termination or in a distress termination under ERISA. <u>See</u> 29 U.S.C. § 1341.

[11] Section 1342 gives PBGC the broad authority to initiate an involuntary termination of a plan to protect that plan's beneficiaries or the pension insurance system whenever PBGC determines that certain events have transpired. <u>See</u> <u>Pension Ben. Guar. Corp. v. Heppenstall Co.</u>, 633 F.2d 293, 297 (3d Cir. 1980) (explaining that the statute provides for involuntary termination because asset preservation is critical to PBGC's liability exposure). Under Section 1342, PBGC has discretionary authority to terminate both single employer and multiemployer plans. <u>See</u> also 29 U.S.C. § 1348(b)(2) (referencing termination of multiemployer plan in accordance with Section 1342).

"associated group" of statutes, the fact that Section 1347 provides PBGC with the power to undo both voluntary and involuntary terminations of plans under Sections 1341 and 1342 but is silent as to the power PBGC or any other party to restore multiemployer plans terminated by mass withdrawal, such a power is *expressly* prohibited.  See 29 U.S.C. § 1347.

According to the Fund, PBGC's <u>expression</u> <u>unius</u> argument misses the mark because:  (1) Section 1347 explicitly enumerates <u>PBGC</u>'s power to restore plans, not the rights of any other parties to restore plans; and (2) Section 1347 applies only to the restoration of single-employer plans, rendering PBGC's interpretive canon argument inapplicable.

Title IV does not explicitly prohibit a private party from restoring a multiemployer plan that was terminated under Section 1341a.  Title IV also does not explicitly authorize restoration of a plan by a plan sponsor.  While both parties contend that their respective interpretations indicate that Congress unambiguously answered this question in their favor the Court assumes that, for purposes of the <u>Chevron</u> Step One analysis, Title IV is "silent or ambiguous" on this question.

The Court then turns to <u>Chevron</u> Step Two where the question for the Court is whether PBGC's interpretation is "based on a permissible construction of the statute," <u>Chevron</u>, 467 U.S. at 843, or, in other words, "within the range of permissible readings of the statute."  <u>Cmty. Health Care Ass'n of New York v. Shah</u>, 770 F.3d 129, 146 (2d Cir. 2014).  PBGC's interpretation of Title IV need not be "the only one it permissibly could have adopted…, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."  <u>Chevron</u>, 467 U.S. at 843, n.11.  Indeed, it need only be "reasonable."  <u>Catskill Mountains</u>, 846 F.3d at 507.

While the parties each marshal arguments in favor of their respective interpretations, it cannot be said that PBGC's interpretation is unreasonable, arbitrary, or capricious.  PBGC's interpretative argument based on the <u>expressio</u> <u>unius</u> canon is reasonable and a permissible construction of Title IV.  See <u>Chevron U.S.A. Inc. v. Echazabal</u>, 536 U.S. 73, 80 (2002) (quoting

United States v. Vonn, 535 U.S. 55, 65 (2002)) ("[E]xpressing one item of [an] associated group or series excludes another left unmentioned."); N.L.R.B. v. SW Gen., Inc., 580 U.S. 288, 302 (2017) ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health.").  The fact that ERISA is a "comprehensive and reticulated statute"— where, given its provisions concerning termination and restoration, one would expect Congress to explicitly authorize the restoration of terminated multiemployer plans by private parties if it intended to permit such restorations—further buttresses the reasonableness of PBGC's interpretation.  Nachman Corp. v. Pension Ben. Guar. Corp., 446 U.S. 359, 361 (1980).  The legislative history cited by PBGC also weighs in favor PBGC's interpretation.  (See PBGC Mem. at 13–14.)  Finally, PBGC offers a compelling rationale why, when Congress enacted all the provisions cited above addressing termination and withdrawal, Congress did not authorize the restoration of multiemployer plan that were terminated by mass withdrawal.  Prior to the passage of the SFA program, there would have been little reason for parties to seek such restoration—a point driven home by the fact that, to PBGC's knowledge, no other parties have ever attempted to restore such a terminated plan.  (PBGC Mem. at 5-6.)  Based on the points above, the Court concludes that PBGC's interpretation of Title IV as prohibiting restoration of a multiemployer plan terminated by mass withdrawal is, even if not the only possible interpretation, certainly within the range of reasonable interpretations.[12]

## C.  Section 1441

PBGC's primary argument is that Title IV's silence concerning the permissibility of restoring multiemployer funds that were terminated via mass withdrawal precludes such

---

[12] Moreover, even if Chevron was inapplicable to PBGC's Section 1347 arguments, the Court would still agree with its interpretation of that Section.

restoration.  PBGC also asserts that one specific provision of Title IV, Section 4281, 29 U.S.C. § 1441, also indicates that underfunded multiemployer plans that were terminated via mass withdrawal cannot restored.  PBGC's argument appears to be that even assuming <u>arguendo</u> that Title IV does not, per se, prohibit restoration of multiemployer funds terminated via mass withdrawal, Section 1441 precludes the specific manner in which the Fund purported to restore itself—namely, by installing a new bargaining unit and taking on additional, new liabilities, for those new employees in order to effectuate the Fund's purported restoration.

Section 1441 addresses the benefits provided by plans that are terminated via mass withdrawal.  According to PBGC, "Section 4281 effectively prohibits a multiemployer plan terminated by mass withdrawal from increasing benefit liabilities while its liabilities exceed its assets."  (PBGC Mem. at 16.)  Here, the Fund's purported transformation from terminated to restored appears to have been accomplished through the execution of a collective bargaining agreement that increased the Fund's benefit liabilities.

The Fund responds to PBGC's Section 1441 argument by insisting that Section 1441 only applies to terminated plans and that, once its restoration was accomplished, the Fund no longer had to comply with Section 1441.

As PBGC's reply brief points out, the Fund seems to be arguing that it "was restored at the moment an employer and union (allegedly) amended their CBA to require contributions to the terminated Fund, and that this happened before the newly active Fund participants performed any work covered by the amended CBA, so before they accrued any benefits, so the Fund had not yet increased its benefit liabilities when it was restored, so the restoration, while it entailed benefit increases, did not violate section 4281."  (PBGC Reply at 7-8.)  According to PBGC, this "is an obtusely literalistic interpretation of section 4281, defiant of the purpose manifest in the text, to preserve the limited assets of an underfunded terminated plan—which by definition has no

contributing employers (or, in Fund's case, assuming restoration were possible, a de minimis contribution base completely inadequate to its liabilities)—for payment of nonforfeitable benefits already accrued and, when that becomes impossible, for guaranteed benefits." (PBGC Reply Mem. at 8.)  As such, PBGC contends that its "contrary, reasonable interpretation [of Section 1441] must be upheld." (Id.)

Because the Court determined earlier that that Title IV does not permit restoration of multiemployer funds terminated via mass withdrawal, it is unnecessary to determine whether the path the Fund took to its purported restoration also specifically violates Section 1441. As PBGC points out, the relevant "CBA amendment was not in the administrative record before PBGC." (PBGC Reply Mem. at 7 n.4.) Accordingly, the Court declines to reach this issue. The Court also notes that the parties' arguments concerning Section 1441 are underdeveloped. The Fund does not address the specific provisions of Section 1441 or explain how the manner in which it purportedly restored itself complied with Section 1441. And PBGC's papers are less than precise in identifying the particulars of its "interpretation" of Section 1441. Ultimately, it is unnecessary to reach this issue in light of the Court's conclusion, in the prior section, that the Funds' restoration was not permitted irrespective of the means it sought to accomplish that goal.[13]

---

[13] Even if the Fund could establish that the manner in which it purportedly restored itself did not violate the letter of Section 1441, the purpose and structure of Section 1441 could potentially support to PBGC's broader argument that, considering Title IV in its entirety, Title IV's silence concerning the restoration of multiemployer funds terminated via mass withdrawal establishes that such restorations are prohibited.

## IV.     CONCLUSION

For the foregoing reasons, the Court grants PBGC's motion for summary judgment and DENIES the Fund's motion for summary judgment.  For the reasons explained above, the Court affirms PBGC's denial of the Fund's SFA application as that denial was not erroneous.  The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**

Dated:  October 26, 2023
Central Islip, New York

_____/s/_ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE